**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CONSTANCE HENRY, on behalf of herself, and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 25-cv-3151 |
| v. | ) ) | Hon. Steven C. Seeger |
| OMOI, INC., | ) ) | |
| Defendant. | ) ) ) | |

**MEMORANDUM OPINION AND ORDER**

Constance Henry, a blind person, wanted to buy a pen. She decided to do some shopping online, and she found her way to Omoi Inc.'s website, Omoionline.com. And that's where the virtual shopping trip went awry.

Henry couldn't see the website, and it didn't support a screen reader to help the visually impaired. She needed help from someone else to buy the pen. So she sued. Henry filed a complaint against Omoi, alleging a violation of the ADA.

Her return to the Dirksen Federal Building was something of a homecoming for her. She is a frequent filer, having filed dozens of cases in this district about websites that allegedly violate the ADA. If plaintiffs could earn frequent filer miles, she would have platinum status.

This Court asked Henry to explain why the ADA governs the accessibility of websites. A few weeks later, the parties settled. And they moved this Court to enter a proposed consent decree.

The parties submitted a proposed order, but it has a few problems. For starters, the proposed order does not comply with Rule 65(d). The parties also don't explain why a consent decree is appropriate.

For the reasons stated below, the motion for entry of a consent judgment or consent decree is denied.

## Background

Constance Henry is "legally blind." *See* Cplt., at ¶ 2 (Dckt. No. 1). And she likes pens. *Id.* at ¶¶ 10, 39. In fact, Henry has "a collection of pens from various famous brands and a refined taste and appreciation for fine writing instruments." *Id.*

Henry also has a flair for gift-giving. She wanted to share the gift of writing and penmanship with others. So, she decided to buy a pen "as a thoughtful gift for her closest friend." *Id.* As a pen expert, Henry knew what to buy – "a branded sports pen." *Id.*

Henry hopped on the internet to find a digital pen store. *Id.* Blind people have various tools that they can use to navigate websites. *Id.* at ¶¶ 7, 19, 25, 33, 39. Henry, for instance, uses a screen reader, which reads text from a website out loud. *Id.*

Websites can help blind people in other ways, too. Using alternative text and thoughtful, well-designed headings can make information more digestible for screen readers.

While browsing for pens, Henry allegedly found her way to the website of Omoi. *Id.* at ¶¶ 10, 39. And that's when she ran into trouble.

Omoi sells premium pens, high-quality stationery products, and other goods on its website. *Id.* at ¶¶ 5, 39–40. But according to the complaint, Omoi's website isn't accessible to blind people. *Id.* The website doesn't use proper alternative text. *Id.* at ¶ 35(a). Its drop-down

lists are opaque to screen readers. *Id.* at ¶ 35(h). And Omoi's website practically "requires the use of a mouse to complete a transaction."[1] *Id.* at ¶ 36.

In the end, Henry couldn't purchase a pen without the help of a person who could see. *Id.* at ¶ 7, 39. Henry responded by filing the lawsuit at hand, alleging a violation of the ADA.

This case isn't Henry's first entry into the federal courthouse. Or the second. Or the third. By the sound of things, Henry apparently has had lots of problems shopping on websites. And she has lots of lawsuits to show for it.

Henry has filed dozens of complaints in this district about websites that allegedly do not comply with the ADA. Her lawsuits involve websites that sell all sorts of products, such as health supplements (24-cv-13276, 25-cv-17, 25-cv-2093, 25-cv-2094, 25-cv-11966), backpacks (25-cv-93), outdoor apparel (25-cv-94, 25-cv-13004), "elegant clothing items" (25-cv-280), high-quality footwear (25-cv-281, 25-cv-571), coveralls (25-cv-574), boots (25-cv-825), rugs (25-cv-828, 25-cv-2781), card games about anime or Japanese video games (25-cv-1065), hair dyes (25-cv-1069, 25-cv-1280), stretchy jeans (25-cv-1281), honey (25-cv-1691), Asian-inspired food (25-cv-3145), jewelry (25-cv-3471, 25-cv-8954), sandals (25-cv-3706), snacks (25-cv-3708), women's clothing (25-cv-4020, 25-cv-5064), vacation tours and activities (25-cv-4501), skincare products (25-cv-5073, 25-cv-5076, 25-cv-10236, 26-cv-1558, 25-cv-10325), Chicago-style hot dogs (25-cv-5355), t-shirts (25-cv-8900), glassware (25-cv-8943), kitchen appliances (25-cv-9297), Mediterranean food (25-cv-9804), plant seeds (25-cv-9812), wool bedding (25-cv-12067), swimwear (25-cv-12483), yoga mats (25-cv-13407), duffel bags (25-cv-13408), fitness apparel (25-cv-13864), slippers (25-cv-14983), high quality meat snacks (25-cv-14984), and stylish home furniture and decor (26-cv-1558).

---

[1] The complaint explains that "blind users cannot use a mouse." *See* Cplt., at ¶ 36 (Dckt. No. 1). Instead, they usually "interact with the page using only the keyboard." *Id.*

3

Of all things, Henry filed a new lawsuit yesterday, too (26-cv-2483). She had trouble buying "high-quality body oil and signature fragrance that felt more refined than traditional drugstore options."

That's a lot of shopping gone wrong.

By and large, the complaints are a glorified copy-and-paste operation. Henry simply takes the last complaint, adds a sprinkling of facts about the latest defendant, and launches the new case.

The cases often settle, relatively quickly. It is worth pausing to ask why.

Lawsuits impose costs on defendants. All too often, it is cheaper to settle a case – even if it is meritless – than to fight it. From a dollars-and-cents perspective, it is better to settle a case for $5 than to fight it and win at a cost of $10. Defendants have an incentive to get out on the cheap if they can.

Settling a meritless case might make sense from an economic perspective. But writ large, getting defendants to settle case after case is problematic if the cases have a low probability of success. If litigation costs are driving the settlements, then the settlements feel extortionate.

That principle is true even in cases where a defendant pays nothing, and simply agrees to change its business practices (like the case at hand). A defendant might decide that changing its website is cheaper than fighting a lawsuit about changing its website.

One could be forgiven for wondering whether that's the situation here. Maybe defendants keep settling these cases – even though they might have no merit – because settling is cheaper than fighting.

The ADA prohibits discrimination in a "place of public accommodation." *See* 42 U.S.C. § 12182(a) ("No individual shall be discriminated against on the basis of disability in the full and

4

equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any *place of public accommodation* by any person who owns, leases (or leases to), or operates a place of public accommodation.") (emphasis added).

The ADA does not define the word "place." But dictionaries reveal that the word typically conveys something physical or spatial. *See* Webster's Ninth New Collegiate Dictionary 897 (9th ed. 1990) ("physical environment"; "physical surroundings"; "an indefinite region or expanse"; "a particular region . . . or location); Webster's New World Dictionary of American English 1031 (3d ed. 1988) ("a square or court in a city"; "space [or] room"; "a particular area"; "the part of space occupied by a person or thing"; "a building or space"); The American Heritage Dictionary 946 (2d ed. 1982) ("A portion of space"; "An area occupied by or set aside for a specific person or purpose"; "A definite location, esp.: An abode, such as a house or an apartment [or] *A business establishment or office*") (emphasis added).

A website is not a place. You can't physically go there. The world wide web isn't a place in the world. If someone asked you to name your favorite places, you probably wouldn't mention the New York Times cooking webpage (as great as it is).

The phrase as a whole sheds light on the meaning, too. "Place" does not stand alone. The statute uses the phrase "place of public accommodation." The last three words modify the first one. A "place" doesn't count unless it's a place "of public accommodation."

A website does not appear to fall within the statutory definition of a "public accommodation." The statute gives boatloads of examples, and all of them are physical locations. It covers an "inn, hotel, motel, or other place of lodging," and " a restaurant, bar, or other establishment serving food or drink," and "a motion picture house, theater, concert hall,

stadium, or other place of exhibition or entertainment," and so on. *See* 42 U.S.C. § 12181(7)(A), (B), (C). A reference to a website is nowhere to be found.

A number of courts have held that websites are not places of public accommodation. *See, e.g.*, *Gil v. Winn-Dixie Stores, Inc.*, 993 F.3d 1266, 1276 (11th Cir.), *opinion vacated on other grounds*, 21 F.4th 775 (11th Cir. 2021) (holding website not place of public accommodation, but later vacated as moot); *Winegard v. Newsday LLC*, 556 F. Supp. 3d 173, 180 (E.D.N.Y. 2021) ("[T]he text of the ADA's definition of 'public accommodation' clearly refers to physical places, and does not include stand-alone websites."); *see also Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1014 (6th Cir. 1997) ("[A] public accommodation is a physical place."); *Ford v. Schering-Plough Corp.*, 145 F.3d 601, 614 (3d Cir. 1998) ("[W]e do not find the term 'public accommodation' or the terms in 42 U.S.C. § 12181(7) to refer to non-physical access or even to be ambiguous as to their meaning."); *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1114 (9th Cir. 2000) ("[S]ome connection between the good or service complained of and an actual physical place is required."); *Magee v. Coca-Cola Refreshments USA, Inc.*, 833 F.3d 530, 534 (5th Cir. 2016).

Most prominently, the Eleventh Circuit held that the "unambiguous and clear" text of Title III of the ADA shows that "websites are not a place of public accommodation." *See Gil*, 993 F.3d at 1276–77. "[Title III] describes twelve types of locations that are public accommodations. All of these listed types of locations are tangible, physical places. No intangible places or spaces, such as websites, are listed. Thus, we conclude that, pursuant to the plain language of Title III of the ADA, public accommodations are limited to actual, physical places." *Id.*

6

But some other courts have gone the other way. *See, e.g.*, *Colon v. HY Supplies, Inc.*, 2023 WL 7666740, at *6 (N.D. Ill. 2023) ("A 'place of public accommodation' does not have to be a physical space."); *Robles v. Domino's Pizza, LLC*, 913 F.3d 898, 904–06 (9th Cir. 2019) (finding that the ADA applies to Domino's website and app when "alleged inaccessibility of Domino's website and app impedes access to the goods and services of its physical pizza franchises"); *see also Carparts Distribution Ctr., Inc. v. Auto. Wholesaler's Ass'n of New England, Inc.*, 37 F.3d 12, 19 (1st Cir. 1994) ("The plain meaning of the terms do not require 'public accommodations' to have physical structures for persons to enter.").

It would be one thing if a plaintiff alleged that a website prevented that person from entering a physical place. *See Robles*, 913 F.3d at 905 (noting that a "nexus" between the website and physical stores "is critical to [the] analysis"). For example, imagine if a person needed to visit a website and register online before entering a hotel. That's a barrier to entering a physical location.

But that's not the situation here. Henry isn't complaining that she couldn't go to a place. She complains that she couldn't see a website.

True, the Department of Justice offers a more expansive reading of the statute. In 2022, the Department of Justice issued guidance on the topic. The DOJ took the position that "the ADA's requirements apply to all the goods, services, privileges, or activities offered by public accommodations, including those offered on the web." *See* U.S. Dep't of Justice, *Guidance on Web Accessibility and the ADA, ADA.gov* (Mar. 18, 2022) https://www.ada.gov/resources/web-guidance/.

In 2024, the DOJ incorporated that position in a regulation that applies only to state and local governments. *See* Nondiscrimination on the Basis of Disability; Accessibility of Web

Information and Services of State and Local Government Entities, 89 Fed. Reg. 31320, 31370, n.140 (Apr. 24, 2024) (preserving the position expressed in previous guidance) ("DOJ Regulation").

That regulation does not apply to private actors. Even so, the DOJ stands by its view that Title III applies to websites in the private sector, too. *See* DOJ Regulation, 89 Fed. Reg. at 31370, n.142 (noting a hotel with an inaccessible website "would still have obligations under title III of the ADA," even if not covered by Department regulations) (citing the 2022 guidance).

That reading might stand the test of time. Or maybe not.

All of this is a long way of saying that the cases have a questionable footing. But the merits questions have fallen by the wayside in dozens of cases filed by Henry. Each case ends shortly after it starts. Defendants keep settling before the cases get very far, leaving important questions unanswered.[2]

In any event, the case at hand didn't get very far before peace broke out. This Court asked Henry to address whether the ADA applies to websites. *See* 7/30/25 Order (Dckt. No. 16). This Court also directed Henry to file a spreadsheet and identify all of the ADA lawsuits that she has filed. *Id.*

---

[2] Standing issues loom large in ADA tester cases, too. By the look of things, Henry is an ADA tester plaintiff. She visits websites and tests their compliance with the ADA. There is a circuit split on whether ADA testers have standing. *Compare Laufer v. Acheson Hotels, LLC*, 50 F.4th 259 (1st Cir. 2022) (concluding that testers have standing); *Laufer v. Arpan LLC*, 29 F.4th 1268 (11th Cir. 2022) (same), *vacated on other grounds*, 77 F.4th 1366 (11th Cir. 2023); *Laufer v. Naranda Hotels, LLC*, 60 F.4th 156 (4th Cir. 2023) (same); *with Laufer v. Looper*, 22 F.4th 871 (10th Cir. 2022) (concluding that testers lack standing); *Laufer v. Mann Hosp., LLC*, 996 F.3d 269 (5th Cir. 2021) (same), *Harty v. W. Point Realty, Inc.*, 28 F.4th 435 (2d Cir. 2022) (same). The Supreme Court nearly resolved the standing issue. *See Acheson Hotels, LLC v. Laufer*, 601 U.S. 1 (2023). The Supreme Court granted certiorari, but later dismissed the suit for mootness. *See Laufer*, 601 U.S. at 4. Even so, the Supreme Court noted that "the circuit split is very much alive." *Id.* at 5. Whether a particular plaintiff has standing depends on the facts of the case. Still, if a plaintiff brings case after case, one has to wonder whether the injury is real, or manufactured. *See FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 381 (2024) ("An injury in fact must be 'concrete,' meaning that it must be real and not abstract.").

Henry complied. From December 2024 to May 2025, a span of only six months, Henry filed 29 lawsuits in this district. *See* Spreadsheet (Dckt. No. 14-1). And the lawsuits keep coming. According to the Clerk's Office, Henry has filed 20 lawsuits since then.

That's 49 lawsuits in 15 months, give or take.

Only a few weeks after this Court asked its questions, the parties reached a settlement. The filing included a wrinkle. Most of the time, litigants reach a settlement, file a notice of dismissal under Rule 41, and call it a day.

The parties at hand took a different approach. They filed a motion for entry of a proposed consent decree. *See* Agreed Motion for Entry of Consent Judgment, at 1 (Dckt. No. 19). By the sound of things, entering into consent decrees in ADA cases has become a cottage industry. "The attorneys and firm representing Defendant have resolved more than 125 other ADA website class actions in other districts in which similar consent decrees have been so-ordered." *Id.* at 2.

The parties submitted a proposed "Consent Judgment Order," which barely spans two pages. *See* Consent Judgment Order (Dckt. No. 19-2). The draft order doesn't say much.

The proposed order declares that "[t]he provisions of this Consent Judgment [sic] shall be binding upon the Parties." *Id.* at ¶ 2. That provision presumably is a mistake. The parties probably meant the judgment to say that the *consent decree* (not the judgment) is binding on the parties. It wouldn't make sense for the judgment to say that the judgment is binding, because that goes without saying.

The details appear in the accompanying document, entitled "Consent Decree." *See* Consent Decree (Dckt. No. 19-1). The Consent Decree includes 20 paragraphs. It basically says

that Omoi will bring its website into compliance with the ADA. *Id.* at ¶¶ 11–12. The obligation lasts for 36 months.

## Analysis

The proposed consent judgment suffers from a few problems. For starters, the draft does not satisfy the requirements of Rule 65. And the parties have not explained why they need it.

"A consent decree is a court order that embodies the terms agreed upon by the parties as a compromise to litigation." *United States v. Alshabkhoun*, 277 F.3d 930, 934 (7th Cir. 2002). More simply, consent decrees are party-agreed, court-enacted settlements. *See Metro. Life Ins. Co. v. Hanni*, 2017 WL 6805318, at *2 (N.D. Ind. 2017) ("[A] consent judgment is . . . an order that adopts and endorses with the court's authority the settlement agreement of private parties.").

"Approval of a consent decree is a judicial act committed to the sound discretion of the district court." *United States v. United States Steel Corp.*, 2021 WL 3884852, at *6 (N.D. Ind. 2021); *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 890 (7th Cir. 1985) (applying an abuse of discretion standard to review the approval of consent decree); *United States v. Whiting Paper Co.*, 644 F.3d 368, 374 (7th Cir. 2011) (same); *Hiram Walker*, 768 F.2d at 890 ("[T]he district court's exercise of discretion is equitable in nature[.]").

Consent decrees are creatures of equity. They are "equitable decree[s], subject to equitable remedies." *See United States v. Krilich*, 152 F. Supp. 2d 983, 990–91 (N.D. Ill. 2001); *Cook v. City of Chicago*, 192 F.3d 693, 695 (7th Cir. 1999) (same). The court uses its equitable powers to make the provisions of a settlement agreement "judicially enforceable." *See Holmes v. Ghodinez*, 991 F.3d 775, 780 (7th Cir. 2021).

A consent decree is a type of injunction. A consent decree puts the "force of law" behind the terms of a settlement. *See Lackey v. Stinnie*, 604 U.S. 192, 207 (2025).

10

So, "consent decree" is simply a fancy name for an injunction by consent. One wonders why they don't call it a consent injunction, or better yet, an agreed injunction. After all, "decree" adds a flavor of royalty, which is antithetical to the American spirit.

Injunctions must satisfy the requirements of Rule 65(d). *See* Fed. R. Civ. P. 65(d). So, consent decrees must comply with Rule 65(d), too. *See Human Rights Defense Center v. Peoria County*, 2025 WL 2999660, at *1 (C.D. Ill. 2025) (stating that consent decrees "must comply with the parameters set forth in Rule 65(d)"); *Blue Cross & Blue Shield Ass'n v. Am. Express Co.*, 467 F.3d 634, 636 (7th Cir. 2006) (explaining that a judgment enforcing a settlement agreement "implies entry of a consent decree" and, "as an injunction," the consent decree must satisfy Rule 65); *Trustees v. CMT Roofing*, 2019 WL 968064, at *2 (N.D. Ind. 2019) (Kolar, J.) ("[A] consent judgment must set forth all the enforceable terms.").

Rule 65(d)(1) establishes the bedrock requirements for an injunction. "Every order granting an injunction . . . must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail – and not by referring to the complaint or other document – the act or acts restrained or required." *See* Fed. R. Civ. P. 65(d)(1).

The proposed consent decree does not satisfy any of those requirements, let alone all of them. The operative document is the "Consent Judgment Order," because that's the document that the parties want this Court to sign.

For starters, the proposed draft does not "state the reasons" for the consent decree. *Id.* This hurdle doesn't seem particularly high. At the very least, the draft should tell the reader something about the nature of the dispute, and confirm that the parties have reached a settlement.

The proposed judgment does not "state its terms specifically," either. *Id.* In fact, it does not state its terms at all.

Four of the five paragraphs seem like boilerplate. One paragraph covers this Court's jurisdiction, and another says that the judgment lasts for 36 months. Another paragraph says that Omoi isn't admitting liability. The last paragraph says that it resolves only this case.

Only one paragraph comes close to revealing the substance of the order. Paragraph two says that the "provisions of this Consent Judgment shall be binding upon the Parties."

That paragraph adds nothing of value. A judgment is binding on the parties by definition.

Maybe the parties intended the judgment to say that the *consent decree* (not the judgment) is binding upon the parties. But if so, that paragraph violates the last requirement of Rule 65(d). An injunction must "describe in reasonable detail – and not by referring to the complaint or other document – the act or acts restrained or required." *See* Fed. R. Civ. P. 65(d)(1).

That provision does not include any "detail[s]" about what the parties need to do. *Id.* Instead, it points the parties to the consent decree (again, this Court assumes that the parties made a typo), which Rule 65(d)(1) expressly prohibits.

An injunction must stand on its own two feet, without resting on the content of some other document. An injunction must give a reader everything that he or she needs to know to figure out the underlying rules that the parties must follow, without digging anywhere else. *See CMT Roofing*, 2019 WL 968064, at *2 ("Thus, a consent judgment must set forth all the enforceable terms."); *Dupuy v. Samuels*, 465 F.3d 757, 758 (7th Cir. 2006) (Posner, J.) ("Rule 65(d) . . . requires that an injunction be a self-contained document rather than incorporate by reference materials in other documents."); *Blue Cross*, 467 F.3d at 636–37 ("The district court did not set out those terms, so the order did not serve as an injunction.").

12

When it comes to consent decrees, Rule 65 is the starting point. But it's not the ending point. Other considerations come into play, too.

A consent decree is more than a contract. "A consent decree reflects the parties' own resolution of the merits, but it is approved and given force of law by the court." *Lackey v. Stinnie*, 605 U.S. 192, 207 (2025); *King v. Walters*, 190 F.3d 784, 788 (7th Cir. 1999) ("[T]he imprimatur of judicial approval gives consent decrees the force of law.").

A consent decree "must (1) 'spring from and serve to resolve a dispute within the court's subject matter jurisdiction'; (2) 'com[e] within the general scope of the case made by the pleadings'; and (3) 'further the objectives of the law upon which the complaint was based.'" *See Komyatti v. Bayh*, 96 F.3d 955, 960 (7th Cir. 1996) (quoting *Local No. 93*, 478 U.S. at 525).

There is some tension in the case law about how much a district court should look at the merits, if at all. On the one hand, a district court "should refrain from resolving the merits of the controversy or making a precise determination of the parties' respective legal rights. The essence of settlement is compromise." *See Hiram Walker*, 768 F.2d at 889; *see also United States v. George A. Whiting Paper Co.*, 644 F.3d 368, 372 (7th Cir. 2011) ("[T]he trial court must defer to . . . the federal policy encouraging settlement.").

On the other hand, a consent decree must be "lawful, fair, reasonable, and adequate." *See Hiram Walker*, 768 F.2d at 889. When making that decision, courts take a sneak peek at the strengths of the case. "In making this determination, the Court may assess the strength of the plaintiff's case compared to the settlement terms; the likely complexity, length, and expense of litigation; the opinion of competent counsel; the amount of opposition to the settlement among affected parties; and the stage of the proceedings and amount of discovery completed at the time

13

of the settlement." *Illinois v. City of Chicago*, 2019 WL 398703, at *4 (citing *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996)).

When it comes to the merits, it's a soft look and a light touch.

A consent decree must draw clear lines, given the consequences of crossing judicial boundaries. "A decree is not exactly a contract; it is an exercise of federal power, enforceable by contempt." *Kasper*, 814 F.2d at 338; *Lackey*, 604 U.S. at 207 ("Violation of a consent decree is enforceable by a citation for contempt."). A consent decree is an order, backed by the muscle of the judiciary and the teeth of Article III.

The consent decree at issue here fails to draw clear lines. The boundaries are ill-defined, leaving plenty of room for disagreements. It invites future trouble.

The proposed consent decree begins with a denial from Omoi that its website violates the ADA. *See* Consent Decree, at ¶ 3 (Dckt. No. 19-1). A few paragraphs later, the consent decree includes several obey-the-law provisions, saying that Omoi will comply with the ADA and the regulations when it comes to its website. *Id.* at ¶ 11.

Then, the consent decree attempts to fill in the blanks about what, exactly, compliance means. But the standard is murky, and the line is foggy.

The parties agreed that Omoi "has taken and will continue to take appropriate steps as determined to be necessary with the goal of achieving full and equal enjoyment of the goods, services, privileges, advantages, and accommodations provided by and through the Website." *Id.* at ¶ 12.

Plenty of words in that sentence create wiggle room. What does the phrase "appropriate steps" mean? And how about the phrase "determined to be necessary"? Determined by whom?

14

And what is "necessary"? The "goal" of achieving "full and equal enjoyment" leaves something to be desired, too.

The rule is not judicially manageable. Imagine trying to decide a future motion for contempt that seeks to enforce that standard. A court is ill-equipped to decide if Omoi has complied with that provision, because the standard is covered in haze. It's a recipe for embroiling this Court in a hot mess.

The provisions that follow add to the murky feel. A few sentences address a failure to achieve "substantial conformance with the applicable WCAG standard." *Id.* at ¶ 12.b; *see also id.* at ¶ 13. But as far as this Court can tell, the consent decree does not expressly require Omoi to achieve substantial compliance with WCAG standards (whatever they are).

Judicial resources come into play, too. "Before entering a consent decree the judge must satisfy himself that the decree is consistent with the Constitution and laws, does not undermine the rightful interests of third parties, and is an appropriate commitment of the court's limited resources." *See Kasper v. Bd. of Election Comm'rs of the City of Chicago*, 814 F.2d 332, 338 (7th Cir. 1987).

A consent decree puts the court in the middle of an agreement between the parties. It puts the court in the position of potentially enforcing the agreement and adjudicating future disputes. *See Zurcher Tire, Inc. v. Boland*, 2025 WL 1666035, at *1 (N.D. Ind. 2025) (emphasis added). ("Consent decrees commit a court to continued supervision of the terms of a contract, which any party to the contract may enforce by returning to the court and initiating contempt proceedings.").

15

Enlisting a district court to police a settlement imposes a cost on every other litigant in every other case on that court's docket. The opportunity cost is real, and is paid by everyone else.

"A federal judge must be concerned about other cases. Each district judge in Chicago must resolve about 450 cases per year. Every hour consumed administering a consent decree is an hour taken from other litigants, who must wait in a longer queue." *See Kasper*, 814 F.2d at 341.

It is hard to see why this Court should get in the middle of this dispute and oversee Omoi's website. The parties could achieve the same result with a simple settlement agreement, without a consent decree.

Henry's track record in this courthouse proves the point. Henry has filed 41 lawsuits that are now closed. Of those cases, 41 of the 41 cases were dismissed without the entry of a consent decree.

If there is a good reason why this Court should enter a consent decree in this case, but not the others, the parties didn't reveal what that reason is. The failure to explain the need for a consent decree is an independent reason to deny the request.

"It is not enough that the proposed consent decree contains information that might help the Court decide whether to issue the proposed consent decree. A motion for the entry of a consent decree, even if agreed to by the parties, *must at least briefly explain* why the decree is consistent with the Constitution and laws, would not harm the rightful interest of third parties, and is an appropriate commitment of Court resources." *See Zurcher Tire*, 2025 WL 1666035, at *2 (emphasis added).

16

"A district judge need not lend the aid of the federal court to whatever strikes two parties' fancy." *See Kasper*, 814 F.2d at 338. A "federal court is more than 'a recorder of contracts' from whom parties can purchase injunctions; it is 'an organ of government constituted to make judicial decisions . . . .'" *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 525 (1986); *see also NLRB v. Brooke Indus. Inc.*, 867 F.2d 434, 436 (7th Cir. 1989) (Posner, J.) (in chambers) ("[The parties] are incorrect to contend that I have no choice but to rubber stamp their proposal [of a consent decree].").

Overall, the Court declines the invitation to enter a consent judgment or consent decree and inject itself into the middle of this dispute. The proposal does not comply with the requirements of Rule 65. The proposed consent decree lacks a judicially manageable standard. And the parties don't really need it. Henry knows that she can do without it, because she has done without a consent decree in dozens of other cases.

### Conclusion

For the foregoing reasons, the agreed motion for entry of a consent judgment is hereby denied.

Date: March 6, 2026

Steven C. Seeger
United States District Judge